Filed 12/10/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOSE JUAN PULIDO, | B250802 |
| Petitioner, | |
| v. | (Los Angeles County Super. Ct. No. VA064489) |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING; petition for writ of mandate.  Rand S. Rubin, Judge.
Petition denied.  The stay is vacated.

Vincent James Oliver and Samantha H.M. Kim for Petitioner.

No appearance for Respondent.

Jackie Lacey, District Attorney, Judith Pettigrew and Ellen St John, Deputy
District Attorneys, for Real Party in Interest.

_____

Juan Jose Pulido seeks review of an order in his habeas corpus proceedings, denying his motion to examine a material witness in Mexico on a commission, pursuant to Penal Code section 1349 et seq.[1] We issued an order to show cause. Having considered the parties' petition, return, and reply, and having heard oral argument, we deny the petition.

**BACKGROUND**

In February 2002, a jury convicted Pulido of torture (§ 206), aggravated mayhem (§ 205), kidnapping (§ 207, subd. (a)) and assault with a firearm (§ 245, subd. (a)(2)) of victim Emanuel Cardenas, based on events occurring on March 19, 2001. The court sentenced Pulido to a prison term of 51 years and eight months plus life imprisonment. We affirmed the judgment in a nonpublished opinion (*People v. Pulido* (Dec. 30, 2003, B161450)), and the California Supreme Court denied Pulido's petition for review.

Pulido filed a petition for writ of habeas corpus as to his actual innocence, which was denied by Superior Court Judge Lori Ann Fournier on November 16, 2010. On September 1, 2011, Pulido filed a petition for a writ of habeas corpus in this court, contending that acquired declarations establish that he is actually innocent of the crimes of which he was convicted. On December 2, 2011, we issued an order to show cause, stating that the petition was denied on all other issues and "good cause exists for an evidentiary hearing before the superior court on the issue of actual innocence only." Pulido filed a Code of Civil Procedure section 170.6 peremptory challenge against Judge Fournier, and the matter was reassigned to Judge Rand S. Rubin, who appointed counsel for Pulido on November 26, 2012.

On or about April 2, 2013, Pulido filed a motion in the trial court requesting that Cardenas, the victim, be examined as a material witness in Mexico on a commission. The motion stated that Cardenas wished to recant his testimony at trial that Pulido was the perpetrator. Cardenas had recently been deported to Mexico (according to a

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

declaration from counsel, within the past 60 days),[2] and was living in Rosarito Beach. Cardenas was therefore unavailable as a witness under Evidence Code section 240, and a commission was appropriate to examine Cardenas in Mexico and return his deposition to the court, under sections 1349 to 1351.

**Cardenas's 2008 declaration**

Attached to the motion was a declaration by Cardenas, signed before a notary in Nevada on November 15, 2008. Cardenas stated that he had lied in his preliminary hearing and trial testimony against Pulido, who was not the man who kidnapped and shot him. Cardenas had been trying to buy a gun to protect himself from some other men that he had argued with at a swap meet over their girlfriends. Cardenas asked his sister if he could buy a gun from her friend Pulido. Pulido came over to his house and showed Cardenas a gun on the morning of March 19, 2001, but Cardenas did not have enough money, and Pulido left after a few minutes. The men Cardenas feared then arrived in a van and ordered him inside the van at gunpoint. They headed toward Downey, asking about his friend "Javier" who had been with Cardenas at the swap meet. The men then said they were going to shoot him and leave him paralyzed for not telling where Javier was, for "trying to mess with their lady's" and most of all for "kicking back" with Pulido, who was one of their worst enemies. They threatened his life if he said anything about them to the police.

After Cardenas was released from the hospital, the police came to his house and said they were sure that Pulido was responsible for what happened to Cardenas, and if he did not testify against Pulido, they would bring drug charges against Cardenas. Cardenas was intimidated into testifying against Pulido at the preliminary hearing. At trial, he wanted to tell the truth about Pulido's innocence. One day before the trial he said that Pulido was not responsible, but the judge, the prosecutor, and the defense attorney just looked at him. The prosecutor took Cardenas to his office and told him that the police

---

[2] The record contains a "Warning to Alien Ordered Removed or Deported" dated February 15, 2013, and stating that "Emanual CARDIINAS" had been ordered deported and had been "convicted of a crime designated as an aggravated felony."

3

and the district attorney would give him jail time if he did not cooperate.[3] That night, the men who had kidnapped him called him and said that if he wanted to live, and for the safety of his family, he should testify against Pulido and put Pulido away for them. Under all that pressure, he testified falsely. Days later he sent his friend Gustavo Gallardo to the trial courtroom, to say that Cardenas wanted to recant. While he was trying to hire an attorney to clear the case up, the court sent a warrant for his arrest, and Cardenas was taken into custody. He was appointed an attorney, who told him not to change his testimony or else he would be charged with perjury or face jail time. Cardenas invoked the fifth amendment so he would not incriminate himself.

In July 2002 Cardenas was contacted by Pulido's attorney. Cardenas told him he would cooperate with Pulido's defense, but the lawyer never contacted Cardenas again, and Cardenas decided to move out of state to avoid the real perpetrators and the threats from the police and the district attorney. Cardenas apologized for lying. He was under pressure by two different sides and had no option but to testify falsely to save his life and the lives of his family. "Due to my lies, my conscience has been bothering me . . . [and] I feel it's necessary to acknowledge my old testimony's [sic] in court's [sic] were lies . . . ."[4]

**Evidentiary hearing and denial of motion**

At the evidentiary hearing on April 23, 2013 before Judge Rubin, counsel for Pulido stated that Cardenas was "critical to a presentation of the case. Without him we stand very little chance, I believe, of persuading the court it was not . . . Pulido who

---

[3] Our opinion affirming the conviction on direct appeal, among other conclusions, found no prosecutorial misconduct connected with Cardenas's sporadic statements that Pulido did not shoot him: "The only evidence presented here is that the prosecutor never threatened Cardenas with a perjury charge or with jail if he changed his testimony. Instead, the prosecutor repeatedly told Cardenas to tell the truth. That Cardenas was afraid of being charged with perjury is consistent with his reluctance to change his testimony notwithstanding defendant's intimidation of him. Finally, it was Cardenas's appointed counsel who advised him he might face a perjury charge if he recanted his testimony, not the prosecutor." (*People v. Pulido*, *supra*, B161450, p. 11.)

[4] The court admitted the declaration into evidence at the evidentiary hearing.

4

committed this crime against the recanting witness." Counsel argued that the statutes authorizing a commission to examine witnesses applied on collateral review as well as at trial. The court concluded that the statute should be narrowly construed, and denied the motion for a commission and a request for a continuance.

The attorney who had been the prosecutor at Pulido's trial in 2002 testified that he remembered Gallardo as someone who "was there to keep . . . Cardenas from testifying." He also remembered Cardenas "at some point indicating that he had identified the wrong person," and denied threatening anyone. When Cardenas took the stand, he began to cry and seemed very frightened. Nevertheless, Cardenas told the truth.

Gallardo testified that on the date Cardenas had been kidnapped, he saw Cardenas in front of his house talking to Pulido.[5] After Pulido left, Gallardo saw a van drive by and slow down. Cardenas later told Gallardo that the people in the van kidnapped Cardenas after Pulido left, and that the kidnappers threatened to come back and harm Cardenas's family if he did not testify that Pulido was the man who had kidnapped him. When Gallardo was subpoenaed as a witness, he told Cardenas to tell the truth, but the prosecutors threatened Cardenas and Gallardo they would go to jail for perjury. Gallardo took the stand and lied, afraid to go to jail. He was not afraid of Pulido. The district attorney asked Gallardo if he "remember[ed] telling the jury exactly what [he] just said here, that there was some mysterious van that was buzzing around your neighborhood and that . . . Pulido is totally innocent and . . . Cardenas told you that these mysterious people did it instead?" Gallardo replied: "I don't remember that."

The evidentiary hearing was set to resume on April 25, 2013, but Pulido filed a petition for writ of mandate on April 24, 2013, and that same date this court issued a stay of the evidentiary hearing. On June 12, 2013, this court issued an order stating that Pulido's petition was premature, and denied the petition "without prejudice to petitioner filing a new petition for writ of mandate, with a declaration from petitioner's counsel to

---

[5] A declaration from Gallardo dated June 25, 2010 is consistent with his testimony.

be filed in the trial court, indicating that counsel has information from Cardenas, directly, of the time and location where Cardenas will make himself available for the deposition upon the issuance of a Commission."

On August 19, 2013, Pulido filed a first amended petition for writ of mandate, with a declaration from counsel stating that counsel personally spoke by telephone with Cardenas, and Cardenas confirmed that he would appear on September 28, 2013 at 12:00 p.m. at an address in Rosarito, Baja California. This court denied the first amended petition without prejudice "as the matter is pending in the Los Angeles Superior Court."

At the resumption of the evidentiary hearing on August 21, 2013, the court acknowledged receipt of the declaration giving a time and place where Cardenas would make himself available. The district attorney argued that even if the statute authorizing a commission were to apply to an evidentiary hearing in a postconviction proceeding, it was within the discretion of the court whether such a commission should be appointed. It was not clear that the voice on the telephone was Cardenas. Further, Cardenas had already recanted before the jury, who rejected that recantation and convicted the defendant. "[W]e don't know how a deposition will add anything to this."

The court mentioned Cardenas's notarized recantation, and concluded: "I really don't know what more a deposition would add. It certainly does not give me the ability, as I've indicated a couple of times in the past, to actually observe the witness, see how the witness answers the questions, and even ask my own questions of the witness."[6] The court had read the trial transcript and would have questions for Cardenas about the sequence of events. "I don't see how much a commission appointed to examine the witness in Mexico would assist this court. I just don't see it. Maybe the court of appeal sees it different than I do, but I don't see it. [¶] Again, the motion for a material witness

---

[6] The trial court referred to "the Cardenas letter that is attached to all of [the] motions. It is dated September 10, 2011, the time that he put together a notarized letter recanting his testimony." Cardenas's notarized statement was in 2008. The court apparently referenced the date that the notary's appointment was set to expire, which appears on the same page as Cardenas's signature.

to be examined by a commission in Mexico pursuant to . . . section 1349 is again respectfully denied."

This court stayed the habeas corpus proceedings and the continuation of the evidentiary hearing scheduled for September 4, 2013, and on September 5, 2013, we issued an order to show cause why a peremptory writ should not issue ordering that the August 21, 2013 order denying the motion for appointment of a commission be vacated.

## DISCUSSION

"Sections 1349 through 1362 set forth procedures under which a defendant may have a material witness residing outside the state or the country examined on an issue of fact arising in a pending criminal action. The defendant must apply for an order to examine the witness upon a commission (§§ 1349, 1350), based on an affidavit stating that the testimony of the witness is material to defense of the action. (§ 1352; see *People v. Cavanaugh* (1968) 69 Cal.2d 262, 266 [holding a witness may not be deemed material on the basis that he or she possibly could provide pertinent testimony in trial; the defense must demonstrate materiality at the hearing].) If the court 'is satisfied of the truth of the facts stated, and that the examination of the witness is necessary to the attainment of justice,' it must order issuance of a commission to take the witness's testimony. (§ 1354; *People v. Stewart* (1924) 68 Cal.App. 621, 624 . . . .)" (*People v. Salcido* (2008) 44 Cal.4th 93, 131.) The commission is a process issued under court seal, authorizing a designated person to take the deposition of the witness and return it to the court. (*Ibid.*; § 1351.) "Depositions taken under the commission may be read in evidence by either party at trial on a finding the witness is unavailable under Evidence Code section 240. (§ 1362.) The procedure does not afford any means by which such testimony may be compelled; obtaining the testimony is subject to the consent of the person whose testimony is sought. [¶] The trial court's ruling on the application is reviewed for an abuse of discretion. [Citation.]" (*Ibid.*) The trial court's initial ruling that the statutes do not apply to postconviction proceedings, however, is a purely legal question which we review de novo. (*People v. McDonald* (2013) 214 Cal.App.4th 1367, 1379.)

7

Pulido concedes—and we agree—that there is no case authority stating that section 1349 et seq. applies to postconviction proceedings. Respondent urges that the statutes apply only to trial, rather than to ancillary or postconviction proceedings. Section 1349 provides: "When an issue of fact is joined upon an indictment or information, the defendant may have any material witness, residing out of the state, examined in his behalf, as prescribed in this chapter, and not otherwise." Section 1352 provides that the application must be made upon affidavit, stating: "1. The nature of the offense charged; [¶] 2. The State of the proceedings in the action, and that an issue of fact has been joined therein; [¶] 3. The name of the witness, and that his testimony is material to the defense of the action; [¶] 4. That the witness resides out of the State." (§ 1352.) If an affidavit shows that such a issue of fact has been joined, and "that the examination of the witness is necessary to the attainment of justice," the court may direct "that the trial be stayed for a specified time, reasonably sufficient for the execution and return of the commission." (§ 1354.) Further, "[t]he depositions taken under the commission may be read in evidence by either party on the trial if the court finds that the witness is unavailable as a witness within the meaning of [s]ection 240 of the Evidence Code." (§ 1362.)

While the statutes reference "trial" proceedings, the essence of the commission procedure is to allow a defendant to provide material testimony from an out-of-state witness when "an issue of fact has been joined" and when the "examination of the witness is necessary to the attainment of justice." (§§ 1352, 1354.) This case presents just such a situation. We have ordered the trial court to conduct an evidentiary hearing on actual innocence, joining the ultimate issue of fact, which is whether Pulido was innocent of the offenses for which he was convicted. Under these circumstances, the examination of a material witness is "necessary to the attainment of justice." When actual innocence is in issue posttrial, the trial court retains its statutory authority to order examination on a commission, because its objective is the same as in a trial proceeding.

That the court has the authority to order such an examination does not, however, require the court to do so upon every request. While we disagree with the trial court's

8

conclusion that the statute does not apply in this case, we see no abuse of discretion in the trial court's additional ruling, in which it found that Pulido had not demonstrated that the examination of Cardenas in Mexico would assist the court as a trier of fact. The court concluded that Cardenas's declaration, meant to show that the examination would produce material evidence, did not include anything materially different from his trial testimony and thus it would not be necessary to the attainment of justice. We describe the trial testimony below.

**Trial testimony**

In opening statements, the prosecution warned the jury that Cardenas would testify, but "I can't tell you what he's going to say because you're going to hear evidence that yesterday he made the statement, 'This is not the person who shot me,'" even though Cardenas had identified Pulido as the perpetrator at the preliminary hearing. The jury would also hear that Cardenas "made the statement to the detective and myself that the only reason he said that yesterday is because he's afraid, having been shot twice. He's afraid for his family, and he's afraid for himself. [¶] So what he ultimately says when he takes that stand, I can't tell you at this point, but you will have the opportunity to watch his demeanor, and that is part of the evidence too. And you can determine, in the event that his account of events has changed, whether or not he's being truthful and honest with you, and you can take that into account." The defense conceded that there would be "a bit of drama going on" as to whether Cardenas would identify Pulido as the person who shot him, and the jury should examine "your willingness to believe [Cardenas]."

Cardenas took the stand and testified that "[j]ust guys" shot him, refusing to answer when asked who held the gun. He was living at a different address because he was scared. Cardenas had told the truth at the preliminary hearing, when he reviewed a photographic lineup, and earlier that day when he said who shot him, but now he was worried about his family. The prosecutor asked Cardenas to "look over at this jury and tell them who shot you," and he responded, "Jose," gesturing over at Pulido. The prosecutor got some tissue for Cardenas, who was crying. Cardenas then testified that the morning of the shooting he was outside talking to Pulido, who had a gun in his hand,

9

about someone named Javier; Cardenas told Pulido he did not know where Javier was. Pulido told him to get inside a van, and Cardenas got into a van with Pulido and someone else, afraid they would shoot him. They drove him to Downey and told him to get out of the van. Pulido asked Cardenas if he had even been paralyzed, and shot Cardenas in his right knee. Cardenas began to wrestle with Pulido, trying to grab the gun, and then turned and began to run. Cardenas was shot again in his right side and in his arm, and heard more gunshots.

After a break, Cardenas did not return until nearly an hour after testimony was set to resume; during part of the delay he was with Gallardo.

When direct examination resumed, Cardenas testified that he had identified Pulido in a photographic lineup the day after the shooting. Cardenas also acknowledged that the day before his testimony, he told the prosecutor that two or three weeks earlier, he had told Gallardo that Pulido was not the shooter. He had said that it wasn't Pulido because he was scared.

On cross-examination, Cardenas said he was still frightened of some people who had "chase[d] [him] around once" after a dispute about a girl, and who had threatened him and rode around his parents' house. He repeated that Pulido had forced him into the van at gunpoint. Cardenas admitted that the day before he told the prosecutor that Pulido was not the man who shot him, but denied telling that to Gallardo. Pulido had not threatened him and no one had asked him to lie on the stand, but Cardenas had told two different stories. He denied telling anyone that he wanted to change his story at the preliminary hearing. "The person that shot me is the same man. It's him [Pulido]." He had wanted to change his testimony yesterday because he was afraid: "They'll do something." Asked, "Who?" Cardenas answered, "I don't know, man. There's people outside." It was just fear that made him say that Pulido was not the shooter. He was also afraid of being prosecuted for perjury. The day before, he was "[j]ust saying the truth." Cardenas had not told anyone other than the prosecutor that he wanted to change his testimony. Pressed again, Cardenas reaffirmed that he was "telling the truth today": "Jose is the one that shot me." The prosecutor just told him to tell the truth. It was only

10

fear that had caused him to say the day before that Pulido was not the shooter. The last words of Cardenas's testimony were: "He's the one that shot me."

Gallardo testified that on the day of the shooting he saw Pulido with Cardenas in front of Cardenas's house, a van was in the driveway. Cardenas and Pulido were talking about "Javier." Gallardo saw that Pulido had a gun, which scared him. Gallardo left the driveway shortly thereafter. Gallardo had identified Pulido in a photographic lineup, and had written "'[t]hat's Jose. Told friend that [sic] to get in the car with the gun.'" At first, Cardenas told Gallardo that Pulido shot him, but about three weeks ago Cardenas told Gallardo that Pulido did not shoot him and that he had lied to Gallardo and everyone in the court. Gallardo told him to tell the court, and Pulido had been depressed and under pressure.

In closing, the prosecution pointed out that when Cardenas was asked to identify the shooter, he became upset and began to cry, which was natural: "This is somebody who has almost killed him before." Nevertheless, he had identified Pulido as the shooter. Outside in the hall the day before, when he was not under oath, Cardenas said Pulido was not the shooter, but he was "scared about what's going to happen if he comes in here and does what he did and tells you the truth." He only made that statement once. The jury should discard Gallardo's version of events "because it's clear he's doing everything he can to distance himself from the case and the case from the defendant." All the evidence from the beginning pointed to Pulido as the shooter, and the jury could be satisfied beyond a reasonable doubt of Pulido's guilt.

Pulido's counsel argued that the jury should believe Cardenas's recantation, and that Cardenas cried while identifying Pulido because he was aware he was about to do something wrong, and the jury should not believe his testimony. "[I]t's a matter of credibility. Can you believe Emanuel Cardenas? Which one of his stories is correct . . . .?" In rebuttal, the prosecutor urged the jury to consider Cardenas's demeanor to decide whether he testified truthfully when he testified, "'He's the one who shot me. He's the one who shot me.'"

11

Our review of the trial transcript demonstrates that the trial court, who also read the transcript, did not abuse its discretion in denying the motion for a commission on the grounds that it would not produce material evidence to assist the court in adjudicating the claim of actual innocence in Pulido's habeas petition. A commission should be issued if the supporting affidavit explains how the testimony would be material to the defense "and that the examination of the witness is necessary to the attainment of justice." (*People v. Stewart*, *supra*, 68 Cal.App. at p. 624.) Cardenas had already testified at trial, consistent with his earlier identification and his testimony at the preliminary hearing, that Pulido shot him. Cardenas also acknowledged that he had said the day before that Pulido was not the shooter, and had earlier told Gallardo the same thing (which Gallardo confirmed in his testimony), but had done so because he was frightened. He repeated over and over that Pulido was the shooter and that he was telling the truth. The jury heard about Cardenas's momentary recantation of his identification of Pulido as the shooter, and chose to believe Cardenas when he stated on the stand that he was telling the truth, and "Jose is the one that shot me."

Cardenas is not a new witness. His 2008 declaration promises a reprise of the conflicting stories presented to the jury at Pulido's trial; the jury chose to believe Cardenas's trial testimony that Pulido was the shooter. Accordingly, the trial court was within its discretion to deny the motion for a commission to examine Cardenas in Mexico.

## DISPOSITION

The petition for writ of mandate is denied. The stay is vacated.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


MALLANO, P. J.                    CHANEY, J.

12