Filed 8/14/14  In re M.M. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b).  This opinion has not been certified for publication or ordered published for purposes of rule 977.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | B251441<br>(Los Angeles County<br>Super. Ct. No. CK99117) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EDGAR M.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Mark A. Borenstein, Judge.  Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal for Defendant and Appellant Edgar M.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel for Plaintiff and Respondent.

No appearance on behalf of Minor.

* * * * * *

1

Edgar M. (father) appeals from a juvenile court order removing custody of his daughter, M.M., from him and Cherie S. (mother), under Welfare and Institutions Code[1] section 300.  Father claims the juvenile court erred in applying section 361 rather than section 361.2 at the disposition hearing and that the removal order is not supported by substantial evidence.  We affirm because any error in failing to refer to section 361.2 was harmless given the juvenile court's other findings regarding placement of M.M. with father.

### FACTUAL AND PRODUCERAL HISTORY

The family came to the juvenile court's attention after the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of eight-month-old M.M. and her two older half siblings, C.S. (14 years old), and M.S. (13 years old), on April 23, 2013.  Cherie S. is the mother of all three children.  Michael S. is mother's ex-husband and the father of C.S. and M.S.[2]

As sustained under section 300, subdivisions (a), (b) and (j), the petition alleged that, on prior occasions, mother abused C.S. by grabbing his hair and pushing him.  On a prior occasion, mother grabbed C.S.'s neck.  Mother threw and broke C.S.'s camera.  On a prior occasion, mother physically abused M.S. by striking the child's eyes, breaking blood vessels in M.S.'s eyes.  Mother's physical abuse of C.S. and M.S. was excessive and caused the children unreasonable pain and suffering.  Mother's physical abuse of C.S. and M.S. endangered them and M.M., placing the children at risk of physical harm and abuse.  On April 7, 2013, mother engaged in a violent altercation with an unrelated adult, Teodoro Cabral (Ted), in which mother struck his face with her elbow and fists in M.M.'s presence.  Ted struck mother's shoulder during the altercation.  Mother's violent conduct endangered the children's physical health and safety.

---

[1]     All further statutory references are to the Welfare and Institutions Code.
[2]     This appeal does not concern C.S. or M.S., who were placed with their father, Michael S.  The juvenile court issued exit orders and terminated jurisdiction over C.S. and M.S.  In addition, mother and Michael S. are not parties to this appeal.

2

The petition further alleged mother has a history of alcohol abuse and she currently abuses alcohol, which renders her incapable of providing the children with regular care and supervision. On prior occasions in 2012 and 2013, mother was under the influence of alcohol while the children were under her care and supervision. Mother lost consciousness due to alcohol intoxication while M.M. was in mother's care and supervision.

Father knew of mother's alcohol abuse and failed to protect M.M. by allowing M.M. to remain in mother's home where mother had unlimited access to the child. Mother's abuse of alcohol and father's failure to protect M.M. endangered the children and placed them at risk of physical harm.

The detention report stated that C.S. and M.S. were living with their father. M.M. was residing with non-related extended family member, Ted. On April 8, 2013, a referral was generated alleging mother's general neglect, emotional and physical abuse of C.S., which placed his younger siblings at risk. The caller reported that mother is a chronic alcoholic, who drinks daily.

On April 7, 2013, the reporting party received a call that M.M. was in danger because mother was drunk and acting out violently. Mother has violent outbursts when she gets drunk. Ted, who is mother's best friend, was visiting mother on April 7, 2013 and observed mother was intoxicated. Mother was neglecting M.M., who had been crying. When Ted attempted to intervene, mother became very angry and lashed out violently towards her friend. Ted became very concerned and called Michael S. to get contact information about father to advise him of concerns about M.M.'s safety. The reporting party had observed that M.M. had rashes because mother failed to change the baby's diapers.

Father called police but they did not respond. The reporting party was concerned for M.M.'s safety because she had observed mother intoxicated and violent. On February 15, 2013, the reporting party observed mother break C.S.'s camera while mother was under the influence of alcohol. When C.S. became upset, mother followed him into his room, pushed him and began yelling and cursing at the child.

3

Ted reported that he and mother have been friends for about ten years. He was visiting mother's home on April 7, 2013, when she wanted to leave and see M.S. play baseball. Ted did not feel like attending the game so he told mother he would watch M.M. Mother left and went to the game. When she returned home a few hours later, she was aggressive in her behavior. Mother was verbally combative and forcefully took M.M. from Ted. Mother took M.M. into the bedroom where M.M. cried continuously for ten minutes.

Ted went into mother's room where she was cuddled with the crying child, who was trying to push away from mother. When he asked mother for the child, mother told him no. Ted assumed mother had been drinking because she becomes verbally combative and aggressive when she drinks. He asked mother to give him the child but mother was leaning on the child with some of mother's body weight. As Ted tried to reach M.M., mother threw her elbow hitting him in the face. Ted said mother probably did not mean to hit him. But, he was so upset he grabbed mother and pinned her using her sweatshirt. He asked her what she was doing and told her she was going to harm the baby. Mother then punched him in the face. Mother then hit him again; but, after he backed away, she calmed down. After this incident, Ted was concerned about M.M.'s safety so he called Michael S. to get father's telephone number.

Ted reported that the same situation happened with father and mother about a month prior. Mother was intoxicated and punched father when he was trying to get M.M. from mother. The police, who were called to mother's home, told father to leave.

Ted also reported that two weeks prior to the incident between him and mother, she was yelling and screaming at C.S. and M.S. saying "fucking" this and that. He told mother not to talk to the children like that. He said mother did not hit the children; however, that she was verbally abusive to them. He told them to call Michael S. Michael S. took his two children after the latest domestic violence incident between mother and father. According to Ted, the older children are gone because they do not like the way mother is.

4

Ted said mother "had a drinking problem for a while." She began drinking when M.S. was about five years old. Mother's drinking had been getting worse and worse. At one point, mother passed out and he could not wake her.

Ted reported that mother and father have a very combative relationship. Mother knew how to push father's buttons. Mother told Ted and the children that father had hit her a couple of times but Ted had never seen it happen. Mother said father hit her while she had the baby in her arms. Mother had called law enforcement several times concerning father. Ted said father is "'actually pretty good with the baby.'" The problem with mother and father's relationship was mother's drinking, which angered father "but he puts up with a lot."

In an interview with father on April 8, 2013, father reported that about two weeks earlier, he "split up" with mother. He reported that mother has a drinking problem but that she takes good care of M.M. However, he gets worried if mother passes out. He confirmed that Michael S. took custody of his two children two weeks earlier because of mother's behavior.

Father said mother has had drinking problems for about four years except during the time she was pregnant with M.M., when mother seemed to have stopped drinking. Father reported that mother went out to dinner with a friend on Saturday night. When they returned home, mother passed out with M.M. next to her. Ted stayed until mother woke up.

Paternal grandmother was concerned because mother was aggressive towards Ted. Paternal grandmother was also concerned for M.M. when she was with mother, because mother was abusing alcohol and becoming more aggressive. Paternal grandmother visited the family for a week in February 2013. Paternal grandmother was concerned about M.M. because mother did not wake when the baby cried. M.M. had diaper rashes all the time because mother did not change her.

Paternal grandmother said father had a DUI in 2011 but that he stopped drinking when M.M. was born. She said mother calls the police on father and he has to leave the home.

5

Mother reported that she shared a bedroom with M.M. When mother said M.M. slept in the bed with her, the social worker advised mother about the risks of sudden infant death syndrome.

Mother reported that there was domestic violence in her relationship with father. Mother said he hit her on different occasions while she was holding the baby. Mother said C.S. and M.S. witnessed father hitting her but it had been about a year and half since they saw him hit her. The last incident took place on September 26, 2012. Mother reported that father hit her while she was pregnant. Mother claimed she had six police reports regarding the incidents but, the social worker did not see the reports. Mother reported that in one domestic violence incident in February 2013, father kicked in a door while she and M.M. were home. Mother called the police and a report was taken. Mother was trying to rock M.M. to sleep when father told mother to give the child to him. Mother told father no because she did not want M.M. to become stimulated. Mother said it became a "'tug of war'" over M.M. Father hit mother in the face with a closed fist. Mother tried to grab the phone but father took it. Mother went into the bathroom with M.M. until father left. Father moved out of the family home in February 2013.

M.M. appeared to be neatly groomed and clothed. However, when mother opened the baby's diaper, M.M. had a bright red diaper rash. Mother claimed the rash appeared that morning. The social worker observed that the rash looked as though it had been on the child longer than that morning because it was bright red. Mother explained that M.M.'s last rash was a week and half ago. Mother further explained that she had spoken to a pediatrician, who told her to keep the baby dry and that there could be more rashes because mother was introducing "more foods" into the child's diet.

C.S. reported that mother disciplined him by grabbing him by the hair, pushing him, breaking things and yelling. He talked about mother breaking shutters while she was holding M.M. Mother would get drunk and call him names like fat and lazy. Mother called him and M.S. "'the b word and a hole.'" He stated mother broke his camera by throwing it against the wall.

6

C.S. said mother pours alcohol into her soda. He stated, "'I can smell it on her breath and she will get off the elevator and drag herself against the wall.'" He and Ted stopped mother from breastfeeding M.M. because mother was drinking. Every night, mother fell asleep and would not wake up when M.M. would be screaming in the bed right next to her for twenty minutes to an hour. C.S. was concerned mother might sleep on M.M.

He stated that on one occasion, father tried to take M.M. but it became a "'tug of war'" over the child. C.S. told them both to put M.M. down. Father called the police and when they came they told father to leave. C.S. reported that police came to the family home three or four times. Mother told him father hit her with a bamboo stick and pushed her into a frame in the hallway, breaking the frame. Father broke a wooden chair when mother used the chair to block father's entry into the home. During the incident, father kicked in the door. C.S. said mother and father pushed each other and mother repeatedly punched father while he was on the floor. There were so many incidents between mother and father that he could not remember the last one. C.S. said father was a nice guy but he had problems.

M.S. cried throughout her interview because she was concerned about M.M.'s safety and where M.M. would be placed. M.S. did not want to return home but wanted to continue living with Michael S. because she does not feel safe with mother. She stated that two years ago, mother was drunk and, while M.S. was lying in bed, mother came and started hitting M.S. in the eye. The next day blood vessels in M.S.'s eyes popped.

When M.S. went to mother's home on April 4, 2013, she found two empty bottles of alcohol behind trash bags in a cabinet by the table. M.S. stated M.M. would be screaming for ten minutes, right next to mother, who never awakened. M.S. said, "'when my little sister cries, [mother] does nothing at all. She drinks every night and I can smell it on her.'" Mother is sober and nice in the morning but nights are "'scary.'" Mother tells M.S. and C.S., "'you're such a bitch!'"

M.S. said mother gets really mad with father if he does not take out the dogs. When mother has been drinking, she gets mad and tells father he needs to leave. Father

7

cannot stand mother's drinking. Father told M.S.'s grandmother that, when mother drinks, mother becomes a horrible person. Father called the police once because he thought mother was smothering M.M. She reported that she had never seen father hit or become physical with mother but mother told her that father hit mother in the face. M.S. said, "'[Mother] tries to makes us feel scared of him, but [father] isn't going to hurt her or us, but she wants us to think he is a bad guy.'" M.S. said M.M. was not safe with mother.

Michael S. observed father in a physical altercation with a person at mother's home. Michael S. said mother gets drunk and slurs her words. His children are afraid for M.M.

On April 12, 2013, father reported he was living in an apartment. He denied mental health issues or drug use. He admitted he drinks alcohol on occasion, such as the last time he had a drink on Super Bowl Sunday 2013. Father admitted having a criminal history including convictions for public drunkenness in 2009 and a DUI in 2011. Father was on probation and was ordered to take alcohol-related substance abuse classes. He completed a six-week class sometime in 2012.

Father admitted having arguments with mother but said he had never been arrested for anything involving mother. Father said there were three incidents where law enforcement escorted him out of the home. Father admitted forcing a door open, but said it was because mother locked the door and she had all his belongings. He reported an incident involving a picture frame. He was not sure how the picture frame was broken because mother jumped on his back. He was trying to get her off his back. A downstairs neighbor called the police, who handcuffed father when they arrived. They released him when they saw he was sober and mother was intoxicated. He said mother disciplined C.S. and M.S. by yelling at them calling them "'little bitches,'" and smacking the bed to intimidate them. He described mother as a great person when she is not drinking alcohol. When she got pregnant with M.M., mother was drinking every night. Mother appeared to stop drinking when she got pregnant with M.M., however the older children began to find bottles of alcohol in the home. Father said this is when he found out mother was drinking alcohol when she was six months pregnant.

8

Maternal grandmother stated, when she came to visit she learned mother was still drinking. Maternal grandmother was very concerned about mother drinking vodka and caring for M.M. Mother has had a problem with alcohol for a long time. Alcoholism runs in mother's family.

On April 18, 2013, the department assessed M.M. as being at a high risk of suffering emotional or physical harm and took her into protective custody. The department indicated that father was aware of mother's use of alcohol and violent behavior but he failed to take any protective action to ensure M.M.'s safety. Ted was willing to provide care and supervision for M.M. and said he would not allow mother to be alone with the child.

On April 23, 2013, the juvenile court ordered M.M. detained from mother and father. Father was given monitored visits.

In a May 2, 2013, Last Minute Information For The Court, the department reported that Ted's sister, Silvia Cabral (Silvia), telephoned the department on April 30, 2013. She reported being concerned that Ted did not have the ability to say "no" to the parents or to set proper boundaries. Both mother and father called Ted at all hours of the night and blamed each other for the current family situation. Silvia said, "'they all failed [M.M.]; everybody knew about [mother's] drinking and did nothing to protect [M.M.].'" Father made arrangements to visit M.M. on April 28, 2013, but did not show up or call to say he was not going to show up for his monitored visit.

In a pre-release investigation report, the department reported that father complained that Michael S. had taken the two older children from the home and left M.M. with mother. Father criticized the two children and Michael S. for not calling father.

In the May 2013 jurisdiction/disposition report, the department stated M.M. remained placed with Ted. On May 5, 2013, C.S. reported that mother had been abusing alcohol for several years and that the abuse escalated in the last four years. He realized mother abused alcohol because for several years she drove him and M.S. around while she was intoxicated. After M.M. was born, mother continued driving the children

9

around while she was intoxicated. C.S. said mother drank Diet Coke and vodka from a plastic Jack in the Box cup at home and while she was driving. He and M.S. would ask for a drink from the cup while mother was driving. However, mother would always respond that the children could get a drink once they arrived at their destination.

C.S. said the "worst incident" was Thanksgiving 2010. Father invited mother, C.S. and M.S. to his parents' home in Kern County, which was about three to four hours from mother's home. Mother drank a big bottle of Grey Goose vodka during the drive to Kern County. C.S. and M.S., who were in the backseat of mother's car, got into an argument. When they arrived at their destination, mother climbed into the backseat and began hitting C.S. with an open hand and her closed fists. Father observed the incident and asked mother to give him her keys because she was too drunk to drive. Mother refused and the police were called. The police took mother and the children to a motel. After the police left, mother went back, retrieved her car and then drove the children home.

C.S. also described incidents where mother took him and M.S. to visit a friend, Mr. W. The two children would sleep in the car because mother was passed out drunk in Mr. W.'s home and was too drunk to drive.

C.S. reported that mother has anger management problems. Mother gets angry over anything and that her response is very volatile. When she was angry, mother destroyed property whether she was drunk or sober. C.S. said mother would begin drinking alcohol as soon as she got off work. Mother's angry and violent outbursts became worse with her alcohol abuse. Mother broke the kitchen shutters during one angry outburst. On one occasion, mother broke a stool from C.S.'s bedroom. After smashing the stool into pieces, she made C.S. lie on top of the broken pieces of wood and held him down with her foot.

C.S. said father was a "'nice guy'" but was "'sneaky and a freeloader.'" Father primarily drank beer whenever he watched football games on television. C.S. said he had never seen father hit mother; however, C.S. thought father needed help managing his anger. Father would sometimes yell back at mother, who would physically assault father.

10

During one incident, mother had father in a headlock and was hitting his face with a closed fist.

M.S. confirmed C.S.'s statements that mother had been drinking heavily for four years and would drive the children around while she was intoxicated. M.S. also agreed with C.S.'s account that the "'scariest'" incident was the Thanksgiving incident where mother drank Diet Coke and vodka during a four-hour trip to Kern County.

M.S. had never seen father drunk but said he drank beer whenever he watched football. She said, however, that just because she had never seen him drunk did not mean he did not have an alcohol problem. She knew that he had been arrested twice and that alcohol was involved in both arrests. Father was arrested at a club after getting into an argument with someone. He was also arrested for drunk driving. While mother said father physically assaulted her, M.S. had never seen him hit mother. M.S. recalled an incident in which mother had father in a headlock and was hitting him with closed fists. When police responded, they instructed father to leave. M.S.'s only complaint against father was that he never provided for M.M., a conclusion M.S. reached because mother always complained about it.

On May 1, 2013, the investigator met with mother at her home. Although the interview had been scheduled during a telephone conversation on April 27, 2013, mother appeared surprised by the visit. There was a strong bleach odor in the home. Mother explained she had sprayed bleach on the carpet because the dog had urinated on the carpet.

During the interview, mother admitted using alcohol but would not provide her substance abuse history. She would not admit that her alcohol consumption created a child safety concern. Mother said domestic violence between her and father started six months into their romantic relationship. Mother could not provide details but said that the only time father did not hit her was when she was pregnant with M.M. Mother's statement was inconsistent with a prior statement by mother that father had hit her while she was pregnant. Mother abruptly ended the interview stating that it was getting late and that she had to get up early the following day to go to court.

11

During an April 30, 2013 interview, father reported that he met mother at work in 2009. He knew mother drank alcohol but not that she drank excessively or that it impaired her ability to parent M.M. Father criticized Michael S. for taking C.S. and M.S. from the family home and leaving M.M. without considering her safety and well-being. Father was upset that Michael S. did not telephone him about the risk to M.M.

Father confirmed the older children's account of the Thanksgiving 2010 incident. He said mother stopped her car in the middle of the street and was yelling at C.S. Father realized mother was drunk. When he expressed concern about mother driving while intoxicated, they got into an argument. After father took mother's keys, she got more belligerent. After someone called the police, the police took mother's car keys from father and drove mother, C.S. and M.S. to a motel because mother was clearly too intoxicated to drive.

Father said his parents were concerned about his relationship with mother because she was older than he is and she abuses alcohol. Father said he should have paid attention to the signs of mother's alcohol abuse problems but he did not. They had "an off and on" romantic relationship until February 2013. He did not see mother during the week because of the distance to his job, so he had no idea she drank on weekdays. He did not have a concern because, although mother drank heavily during the weekends, father figured she worked all week and was not driving anywhere.

After M.M.'s paternal grandmother visited mother's home for a week, paternal grandmother became concerned for M.M.'s safety. Paternal grandmother witnessed the incident where mother destroyed C.S.'s camera during an angry outburst. She also witnessed mother's verbal aggression toward C.S. and mother's high level of alcohol consumption.

Father explained that he failed to take action to protect M.M. because he feared he would be charged with kidnapping and that an Amber alert would go out on him. Father said he did not know his rights. He sought the advice of a social worker friend from Ventura County, who instructed him to go to court to get an emergency custody order. He went to the police but they could not help him. He went to different courts but did not

12

get any help. He finally contacted the department; however, he did not want "'this' to happen."

Father reported seeing mother destroy property during angry outbursts. He had witnessed mother's verbal assaults on C.S. and M.S. Father was a victim of mother's physical and verbal assaults.

Father denied having a problem with alcohol. He admitted that alcohol had been a factor in his conflicts with mother. However, he denied that he and mother engaged in physical altercations while intoxicated. Father acknowledged that alcohol had been a factor in some of his problems but denied that he abused alcohol. Father reported that he completed a court ordered six-month program and that the last drink he had was on Super Bowl Sunday 2013. Father has enrolled in a domestic violence program.

Father reported that his childhood was happy for the most part. However, his father abused alcohol, which caused problems between his parents.

The department indicated that father's ability to provide proper care, supervision, control and protection of M.M. was impaired by: his denial of mother's extensive history of alcohol abuse including during her pregnancy; his codependent traits coupled with a lack of insight about his role in the current family situation; and his failure to protect M.M. The department assessed that mother was surrounded by people who enabled her denial of substance abuse and were codependents. Mother had created a detrimental family home environment which included verbal and physical assaults on father, Ted, C.S. and M.S. Father's lack of maturity and codependence resulted in his failure to protect M.M. Father complained that no one notified him that M.M. was at risk. However, his own experiences should have reasonably notified him that M.M.'s young age and mother's impaired parenting ability placed M.M. at a very high risk of harm. Father also did not notify anyone about mother's violent verbal and physical assaults on C.S. and M.S.

On May 14, 2013, the department filed a Last Minute Information For The Court attached to which was a copy of the police report of father's arrest on December 17, 2009, for battery on a security guard at a club. The police report states that, after father

13

was escorted out of the club, he punched and kicked a security guard. Father admitted drinking alcoholic beverages after police officers told him that they smelled it on his breath.

In a second Last Minute Information For The Court filed on May 14, 2013, the department reported Silvia had contacted the investigator about M.M.'s placement with Ted, who was living in Silvia's home. Silvia reported that Ted was only interested in making mother happy. Silvia suspected that when she went to work Ted allowed mother into Silvia's home. Mother and father constantly scheduled visits and then would fail to show up or call. When they did visit, they did not take M.M. anywhere; rather, they spent their visits complaining to Ted about Michael S., C.S. and M.S. If mother was visiting, she also complained about father. If father was visiting, he spent the time complaining about mother. Silvia said father knew mother abused alcohol during and after her pregnancy because she heard Ted and father discussing it. Silvia also heard them discussing the fact that mother drove the children around while she was intoxicated. Silvia indicated that she was interested in being M.M.'s foster parent if Ted left her home. Silvia said she would also facilitate sibling visits.

The juvenile court adjudicated the section 300 petition on May 14, 2013. The court sustained the petition under section 300, subdivisions (a) (b) and (j) and found the children were at risk of harm. The court ordered C.S. and M.S. to remain released to Michael S. M.M. was ordered detained in shelter care pending the next hearing. The court then continued the matter to May 15, 2013, for disposition. On May 15, 2013, the court ordered M.M. placed with Silvia and continued the matter for disposition on May 28, 2013.

On May 28, 2013, the department reported that Silvia monitored father's visits, which were every other Friday and every Saturday. She described the visits, which were at her home, as very nurturing. Father would hold and feed M.M. He also played with her, made her laugh and baby talked with her. Silvia and father would go for walks with M.M. M.M. was also having overnight visits with her two older siblings. The court

14

ordered M.M. detained with Silvia and continued the matter to May 29, 2013, for disposition.

At the May 29, 2013 disposition hearing, the juvenile court removed C.S. and M.S. from mother's custody and terminated jurisdiction over C.S. and M.S. with an order giving Michael S. primary physical custody. Mother was given monitored visits until she completed a substance abuse course or she received unmonitored visits with M.M., whichever came first.

In the hearing as to the custody of M.M., father testified that he had signed up for a parenting class on April 25, 2013. He had taken the initiative and signed up for a domestic violence class as well because he was willing to do pretty much anything to get back his daughter. Father also attended Alcoholics Anonymous meetings. Father leased an apartment primarily for M.M., where he lived with paternal grandmother. The juvenile court continued the disposition hearing to June 14, 2013. The department was ordered to complete a supplemental report to address father's residence and childcare for M.M. if M.M. is placed with father.

In a Last Minute Information For The Court filed on June 14, 2013, the department reported that the department investigator (DI) met with father at the new apartment on June 6, 2013. It was father's first apartment and his first priority for furnishing it was to get a crib and playpen for M.M. Father was advised to ask paternal grandmother to move in with him to have "'another set of eyes in the home.'" Father wanted paternal grandmother to be M.M.'s caregiver while he worked. Father was reminded that the court records showed paternal grandmother had a disability. Father said one physician had cleared paternal grandmother to return to work but she was waiting for a clearance from her primary physician.

Father indicated that mother was very good at hiding her alcohol use and does not openly drink. Mother would step out to drink and when she returned home her behavior would change. Father said his counselor informed him that women prefer to drink vodka because it is odorless. Therefore, he could not smell the odor on mother's breath or person. The DI pointed out to father that his inability to notice signs of alcohol use or to

15

smell alcohol was a concern especially since he had grown up in a household in which paternal grandfather regularly abused alcohol and that father has had his own problems in which alcohol played a role.

Mother telephoned the DI on June 11, 2013, to express concern about releasing M.M. to father. Mother said she believed father loved M.M. However, mother was concerned because: he needed to mature; he had never lived on his own; he had never cared for M.M. on his own; and he had anger issues. Mother was concerned about paternal grandmother being the caregiver for M.M. because paternal grandmother had a disability restricting her ability to lift anything over five or ten pounds. M.M., who did not crawl or walk yet, weighed over 17 pounds.

The department's assessment was that it would be premature to release M.M. to father. The department had serious concerns about: father's lack of insight into the role he played in the current family situation; his anger and propensity toward violence; his alcohol-related issues which led to arrests for battery and a DUI conviction; and his denial of knowledge of mother's alcohol abuse. On June 14, 2013, the juvenile court continued the contested disposition hearing to July 22, 2013.

In a Last Minute Information For The Court filed on July 22, 2013, the department attached two domestic battery police reports involving mother and father dated July 25, 2010 and November 13, 2010. In the July 25, 2010 incident, mother said father pushed her with both hands and struck her in the back of the head with his fist before fleeing the location. In the November 13, 2010 incident, mother said father hit her once with a closed fist on the right side of her head. He then walked into the bathroom and punched a hole in the wall. While fleeing the location, he swung the door wide making a hole in the entry-way wall.

An interim review report stated father continued participating in parenting classes. Father had twice weekly monitored visits with M.M.

The department reported that Detective Russell from the LAPD Major Assault Crimes Unit left a voicemail message with the DI on June 18, 2013, which indicated that

16

there were a total of five domestic violence incidents between father and mother. The most recent incident was September 30, 2012, and involved father physically assaulting mother

On June 26, 2013, the DI spoke with Detective Tanner of the LAPD Major Assault Crimes Unit, who said that mother had filed multiple reports against father, one of which was for battery. On July 17, 2013, Detective Tanner reported that on the night of February 24, 2013, mother and father were both extremely intoxicated when they began the "tug of war" over M.M., which ultimately led to police intervention. Mother then took M.M. into the bedroom and rolled on the bed with the baby. It was C.S., who tried to protect M.M. Detective Tanner believed that both mother and father have drinking problems and violent altercations. He also believed that neither parent was fit to care for a baby and that it was good that the department had intervened to remove M.M. from their custody before something happened to her. Detective Tanner believed that it was C.S. and M.S., who ensured M.M.'s safety while they were living in the family home.

Also on July 17, 2013, the department spoke with mother's former neighbor, Lisa Senecal, who reported that she was mother's neighbor for about ten years. Senecal recalled an incident in which mother ran out of mother's apartment and came knocking on Senecal's door seeking refuge from father, who was chasing mother. Senecal allowed mother into the apartment, where Senecal observed marks around mother's neck. Mother said father had wrapped his hands around mother's neck in an attempt to strangle her. Senecal observed marks around mother's neck that were consistent with strangulation marks on several occasions following that incident. When she would ask mother what happened, mother would never give Senecal an explanation. Senecal was also aware of an incident in which father destroyed property in mother's apartment. Senecal said father could "'hold his own'" when it came to alcohol consumption.

The department interviewed mother's former apartment manager, Tony Interdoneto, on July 17, 2013. Interdoneto said that mother often made distress calls to him seeking his assistance in removing father from her apartment, while father resided in the family home. During this time, the tenants in the apartments adjacent to mother's

17

often complained about shouting and commotion between mother and father. Since father moved out, the apartment has been more quiet and peaceful.

The department also attached a Ridgecrest Police Report dated May 19, 2007, describing father's public intoxication arrest. The police report indicated that father was engaged in a verbal altercation and then a physical fight with another man after father was asked to leave a home. Father ultimately punched the kitchen window breaking it. The police report states father had a strong odor of an alcoholic beverage emitting from his breath. His eyes were droopy, bloodshot/watery. Father's speech was slurred and his balance unstable. Father said he had just two beers and said he was "'a light weight'" when it comes to drinking.

The department assessed that there were serious concerns about father's history of alcohol abuse, his unhealthy coping skills, his violent and impulsive behavior, and his lack of insight into his role in the family situation which led to court intervention. Because the issues remained unresolved, father's ability to provide proper care, supervision and protect M.M. was severely impaired placing M.M. at a very high risk of harm particularly because of her young age of ten months.

The juvenile court resumed the disposition hearing on July 22, 2013. Father testified that he was still attending parenting classes. Father was not enrolled in individual counseling. Prior to the department's intervention, mother had custody of M.M. Before January 2013, father was only in the family home on the weekends because of his job. After that time, father was living in the home full-time. Father would take care of M.M., who was a newborn baby. After moving into his current apartment in May 2013, father bought furniture, a crib, diapers and food for M.M. Father played with M.M. during his visits and was teaching her sign language.

Father acknowledged that he had a DUI conviction for which he was still on unsupervised probation. In June 2012, he completed a three-month drug and alcohol course. Father testified that he had never been arrested or convicted as a result of a domestic violence incident. Father admitted he had a 2009 conviction for public drunkenness, for which he was required to complete 160 hours of community service.

18

On cross-examination by county counsel, father testified that he was not enrolled in anger management classes. When questioned by M.M.'s counsel, father admitted police were called to the family home five or six times for domestic violence incidents. Father denied that he currently was drinking alcohol or that he had drunk alcohol after Super Bowl Sunday in February 2013. When asked if the juvenile court were to order him into individual therapy what issues he needed to address, father testified, "I don't know. I couldn't tell you right now." When asked if he thought that there were any issues that he needed to address in individual therapy father replied, "[f]rom my point of view, no." Father was then asked if he was "going to do that just because it was court ordered." Father replied, "No. I mean, eventually, I know that there's going to be some benefit. Obviously, I'm not aware of it right now."

In argument, the department's counsel asserted that M.M. should remain suitably placed with Silvia. M.M.'s and mother's counsel joined in that position. M.M.'s counsel argued that she was concerned in light of new information regarding the extensive domestic violence in the family home. Counsel argued: "I have to admit that, before I got all this new information and the extensive information with regards to the domestic violence that recurred in this house, I wasn't sure what my position will be, but there are police reports. There are a lot of allegations of domestic violence. I am concerned that father is-I think that he may not see that as domestic violence. I think that his view is that this is [mother's] fault, but it takes two foot [*sic*] to tango. I think he plays a role in it. Sometimes he himself was intoxicated when that happened, and there was a lot of domestic violence even if it didn't come to an arrest or to a charge. [¶] I would like to see father in therapy–in intensive therapy with regard to all those issues, and only then to consider [M.M.] going back into his home. Also, in therapy, I would like one of the issues that will be addressed to be anger management and domestic violence issues."

Father's counsel argued M.M. should be released to father's custody. Father was involved in parenting classes, had prepared for M.M.'s return, and was willing to start individual counseling.

19

The juvenile court denied father's request to place M.M. with him. The court stated: "I do appreciate and understand all that you've done to prepare for the return of [M.M.] to your custody, and I think, at some point, that will happen, but I do not feel comfortable today ordering the return to you. [¶] I think that you're on the right track, and that you're doing the things that need to get done, and I hope you will continue to participate and embrace the programs that will be ordered. And, if [M.M.'s counsel] asks you the question again about what you think will help, you'll be in a position to answer that, because I think you will see that in the courses and programs you are going to take."

The juvenile court declared M.M. to be a dependent of the court under section 300, subdivision (b) finding that continuance in the home of either parent was contrary to her welfare and posed a substantial danger to her physical and emotional well-being. There was no reasonable means to protect the child without removal. The child was ordered removed and her care, custody and control were placed under the department's supervision. The court ordered family reunification services, eight random drug tests, individual counseling to address case issues, anger management and domestic violence. The parents received monitored visits. Father's timely appeal followed.

**DISCUSSION**

I. **M.M.'s Removal Under Section 361**

Father claims the juvenile court erred in removing M.M. pursuant to section 361 rather than applying section 361.2. "Matters of interpreting and applying a statute are questions of law. [Citations.]" (*Amdahl Corp. v. County of Santa Clara* (2004) 116 Cal.App.4th 604, 611.) Accordingly, we review de novo the purely legal question of whether section 361.2 applied to the proceeding. (*Pulido v. Superior Court* (2013) 221 Cal.App.4th 1403, 1410.)

Section 361, subdivision (a) (1) provides that when a minor is adjudged a dependent child under section 300, "the court may limit the control to be exercised over the dependent child by any parent or guardian . . . ."

Section 361, subdivision (c) states in part : "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the

20

child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . .   [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody.  The fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent or guardian with whom the minor resided at the time of injury.  The court shall consider, as a reasonable means to protect the minor, the option of removing an offending parent or guardian from the home.  The court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm."

Section 361.2, subdivision (a) states: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

"[S]ection 361.2 governs the child's temporary placement with the noncustodial parent and the provision of reunification services to the parents, and also permits the court to grant legal and physical custody of the child to the noncustodial parent."  (*In re V.F.* (2007) 157 Cal.App.4th 962, 969, superseded by statute on other grounds, as stated in *In re Adrianna P.* (2008) 166 Cal.App.4th 44, 57-58.)  Section 361.2, subdivision (a) requires the court to "first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child."

21

(§ 361.2, subd. (a).)  The court must place the child with the parent requesting custody unless there is clear and convincing evidence of detriment.  (*In re John M.* (2013) 217 Cal.App.4th 410, 420; *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829.)  Section 361.2, subdivision (c) requires the court to make a written or oral finding for its determinations under subdivision (a).  (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 701.)

Father argues, among other things, that the evidence shows that there was no evidence of detriment to M.M. because he had not resided in the family home or engaged in a conflict with mother since February 2013.  The department points out that there is a split of authority as to whether section 361.2 applies to both an offending noncustodial parent and a nonoffending, noncustodial parent.  *In re V.F., supra,* 157 Cal.App.4th at page 969, a Fourth Appellate District decision, considered the issue in the context of an incarcerated father seeking custody of the child and his ability to make appropriate arrangements for the child's care while father was incarcerated.  (*Id.* at p. 965.)  *In re V.F.* concluded: "[W]hen a noncustodial parent is incarcerated, the court must proceed under section 361.2 to determine whether the incarcerated parent desires to assume custody of the child.  Unlike section 361.5, section 361.2 does not distinguish between an offending and nonoffending parent, and the court applies section 361.2 without regard to the characterization of the parent as offending or nonoffending."  (*In re V.F.*, *supra*, 157 Cal.App.4th at pp. 965-966.)

In contrast to *In re V.F.*, *supra*, 157 Cal.App.4th 962 is *In re John M.*, *supra*, 217 Cal.App.4th 410, which was decided by Division One of this District.  *In re John M.* concluded that, although the word "nonoffending" is not found in the text of section 361.2, a parent must be nonoffending before he or she is entitled to consideration under section 361.2.  (*In re John M.*, *supra*, 217 Cal.App.4th at pp. 420-421.)  The issue arose in the context of an incarcerated father where the record showed that the juvenile court had sustained allegations of risk of serious physical harm or illness against the incarcerated father based on a history of quarrels and domestic violence with the child's mother.  (*In re John M.*, *supra*, at pp. 415-417.)  In addition, the father had been incarcerated because of domestic violence against the child's mother.  (*Ibid.*)  Based on

22

these circumstances, *In re John M.* concluded that the incarcerated father was not a noncustodial parent under section 361.2 which generally requires a court to place a child that has been removed from one parent's custody with the noncustodial parent. (*In re John M.*, *supra*, 217 Cal.App.4th at pp. 423-424.) *In re John M.* explained that mere incarceration should not deny a noncustodial parent custody when the parent is able to make child care arrangements. (*Id.* at p. 423.) However, a parent who is an offending parent under section 300, subdivision (b) is precluded from being considered for custody. (*Ibid.*)

In reaching these conclusions *In re John M.*, relied in part on *In re A.A.* (2012) 203 Cal.App.4th 597, which explained that there was a distinction between an incarcerated parent who can make arrangements for the child's care and is seeking consideration under section 361.2 and an incarcerated parent who is the subject of a sustained section 300 allegation in the proceeding. (*In re A.A.*, *supra*, 203 Cal.App.4th at p. 610.) *In re A.A.*, concluded: "[A] parent 'with whom the child was not residing at the time' of the initiation of the dependency, whether or not due to a family law custody order, is presumptively entitled to custody because he or she has not been previously found to pose a risk of harm to the child. It is reasonable to assume the Legislature intended to require a juvenile court to first consider placement of a child with this class of parent, to avert the trauma of a foster placement. A parent who is noncustodial because of a prior finding of detriment is not merely a parent 'with whom the child was not residing at the time' of the events that resulted in the dependency." (*Ibid*; see also *In re M.C.* (2011) 195 Cal.App.4th 197, 224 [referring to placement under section 361.2 with a "nonoffending, noncustodial parent"] and *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1245 [in the absence of a showing of detriment the court must order temporary placement of "the child with the nonoffending noncustodial parent"].)

After *In re John M., supra,* 217 Cal.App.4th 410 and *In re A.A.*, *supra*, 203 Cal.App.4th 507 were decided, the Fourth Appellate District issued *In re Nickolas T.*

23

(2013) 217 Cal.App.4th 1492, which rejected any analyses suggesting that a noncustodial parent is not entitled to consideration under section 361.2 if there is evidence the parent is offending. Citing the plain meaning of the statute, *In re Nickolas T., supra*, concluded that any such analysis is not required before determining section 361.2 is applicable. (*In re Nickolas T., supra*, 217 Cal.App.4th at pp. 1504-1506.) "By its plain terms, section 361, subdivision (c) concerns removal of the child from 'the physical custody of [the] parents or guardian . . . *with whom the child resides* at the time the petition was initiated' (custodial parent). (Italics added.) Section 361.2, subdivision (a) concerns a parent '*with whom the child was not residing* at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child' (noncustodial parent). (Italics added.) Section 361.2, subdivision (a) does not automatically exclude from consideration for placement a noncustodial parent who has a history of incarceration, institutionalization or prior involvement with child dependency proceedings. Instead, it directs the court to place the child with the parent unless placement would be detrimental to the child. [¶] We are not persuaded by the analysis that in view of section 361, subdivision (c) a parent must be both 'noncustodial' and 'nonoffending' to be considered for placement under section 361.2. [Citation.] The term 'nonoffending' does not appear in the text of section 361.2, subdivision (a). [Citations.] Further, section 361, subdivision (c)(1) states the court may remove the 'offending parent' from the home and allow the 'nonoffending parent' to *retain physical custody* on a showing that he or she can protect the child from future harm. Thus, the term 'nonoffending parent' in section 361 refers to a custodial parent who is not the perpetrator of any child abuse or neglect. It does not refer to a noncustodial parent under section 361.2, subdivision (a)." (*In re Nickolas T., supra*, 217 Cal.App.4th at pp. 1504-1505.)

If the noncustodial parent's conduct has contributed to the current dependency proceeding, it can be considered as evidence of detriment under section 361.2,

subdivision (a). (*In re Nickolas T., supra*, 217 Cal.App.4th at pp. 1505-1506.) "The statute does not require the court, prior to assessing whether placement with a noncustodial parent would be detrimental to the child, to first determine whether that parent is a 'nonoffending noncustodial parent' or 'offending noncustodial parent,' and whether that parent retains 'the right to physical custody' of the child. According to the plain language of the applicable statutes, there is no need to address or litigate those issues. (§§ 361, subd. (c) [governing removal from custodial parent] & 361.2, subd. (a) [governing placement with noncustodial parent].)" (*In re Nickolas T., supra*, 217 Cal.App.4th at p. 1505.)

In this case, at the time the dependency proceeding arose, father was no longer residing the family home. Thus, father is correct that his status as an offending parent in the current dependency did not preclude the court's consideration of placement under section 361.2. (*In re Nickolas T., supra*, 217 Cal.App.4th at pp. 1504-1506.)

## II. Harmless Error

The parties dispute whether the juvenile court's failure to consider placement with father under section 361.2 was prejudicial. Father claims a reviewing court should not imply findings of detriment when the juvenile court has erred in applying section 361 rather than section 361.2. (See *In re Abram* (2013) 219 Cal.App.4th 452, 461-462; *In re V.F., supra,* 157 Cal.App.4th at p. 973; *In re Marquis D., supra*, 38 Cal.App.4th at pp. 1824-1825.) If the juvenile court fails to make a finding of detriment under section 361.2, subdivision (a), "the better practice is to remand the matter to the trial court where that court has not considered the facts within the appropriate statutory provisions." (*In re V.F., supra,* 157 Cal.App.4th at p. 973.) Nevertheless, while courts are generally reluctant to imply the findings of detriment, the findings may be implied where the evidence is clear. (*In re Marquis D., supra*, 38 Cal.App.4th at p. 1825; see also *In re Nickolas T., supra*, 217 Cal.App.4th p. 1506 [in some cases the noncustodial parent's history and circumstances clearly warrant a detriment finding].) Moreover, the

juvenile court's findings by clear and convincing evidence that a substantial risk of harm exists to a child and that there are no reasonable means to protect the child without removal from the parents' custody amount to a finding of detriment. (See *In re P.A.* (2007) 155 Cal.App.4th 1197, 1212.)

In this case, the court found that continuance in the home of either parent was contrary to M.M.'s welfare and posed a substantial danger to her physical and emotional well-being; and, there was no reasonable means to protect the child without removal. Thus, the juvenile court clearly considered whether M.M.'s placement with father would be detrimental to M.M. and the findings are tantamount to a finding of detriment.

Substantial evidence supports the finding that placement with father would be detrimental to M.M. At the time of the disposition hearing, M.M. was ten months old. The juvenile court sustained allegations that father failed to protect M.M. from mother's alcohol abuse. The record shows that mother had abused alcohol since 2007 and that father had been dating mother since 2009. It is clear that father knew mother abused alcohol. However, he chose to minimize not only mother's abuse of alcohol but also his own. Father claimed that, because mother's choice of alcoholic beverage was vodka, he was unable to detect it on her breath or her person. Father reported knowing that mother drank excessively but claimed he believed her drinking only occurred on the weekends.

Father also knew that mother was drinking while she was pregnant with M.M. There was an overwhelming amount of evidence that mother drank excessively after M.M. was born and would pass out while caring for M.M. The record shows that mother slept in the same bed with M.M., who would cry incessantly for extended periods of time without waking mother. Indeed, father reported that he was concerned about mother passing out while caring for M.M. M.S. said father had called the police because he thought mother was smothering M.M.

26

Father and mother's family and friends all indicated that mother had a belligerent and volatile personality which became worse when she drank alcohol. Father also knew that mother abused the older children and drove the children around while she was intoxicated. Father knew mother was drunk when she arrived at his parents' home after driving about four hours during the 2010 Thanksgiving incident. Father observed mother yelling at C.S. during this incident. When father expressed concern about mother's conduct and took her keys, the two began to argue and police were called.

Father claims he took affirmative steps to ameliorate the problems that led to the dependency proceedings. He participated in parenting classes and was willing to enroll in individual counseling. In denying father's request for custody of M.M., the juvenile court commended father for his progress but noted that his testimony during cross-examination revealed father did not have a clear understanding of what issues had precipitated the dependency proceedings. The record shows that father lacked insight into the circumstances that had brought the family to the court's attention. He emphasized mother's conduct as the basis for the court's intervention. He either denied knowledge of or minimized mother's alcohol abuse. Father also minimized the consequences of his own alcohol issues, which had led to public drunkenness and DUI convictions. Father also minimized the domestic violence issues including the five or six police calls to the family home while father resided there. The last incident occurred in February 2013 when father engaged in a tug of war with mother over M.M. admittedly when mother was intoxicated. While father claimed only mother was intoxicated, a police officer reported that both mother and father were intoxicated when police officers arrived at the family home on that date. In any event, C.S. had to intervene to protect M.M. from both parents.

The evidence supports the finding that placement with father would be detrimental to M.M. Thus, we find that any error in failing to make a finding under section 361.2

27

was harmless because the juvenile court fully considered the issue whether placing M.M. with father would be detrimental to M.M.'s safety and well-being.

**DISPOSITION**

The order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

FERNS

We concur:

_____, Acting P. J.

ASHMANN-GERST

_____, J.

CHAVEZ

_____

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.